**OPINION OF THE JUSTICES of the Supreme Judicial Court Given Under the Provisions of Section 3 of Article VI of the Constitution.**

Questions Propounded by the House in an Order Dated Jan. 7, 1970.

Supreme Judicial Court of Maine.

Answered Jan. 15, 1970.

---

## HOUSE ORDER PROPOUNDING QUESTIONS

### STATE OF MAINE

In House January 6, 1970

WHEREAS, it appears to the Members of the House of the 104th Legislature that the following are important questions of law and the occasion is a solemn one, and

WHEREAS, a Bill, H.P. 1395, entitled "AN ACT Creating a Nonpublic Elementary Education Assistance Act", Legislative Document No. 1751, has been introduced into the House and is now pending before that body, and the constitutionality of the proposed legislation has been questioned, and it is important that the Legislature be informed as to the constitutionality of the proposed bill,

NOW, THEREFORE, Be It Ordered, that in accordance with the provisions of the Constitution of the State, the Justices of the Supreme Judicial Court are hereby respectfully requested to give to the House their opinion on the following questions:

### I

Do any of the provisions of H.P. 1395, L.D. 1751, violate the Establishment Clause of the First Amendment of the United States Constitution or Article I Section 3 of the Constitution of the State of Maine?

### II

Do any of the provisions of H.P. 1395, L.D. 1751, violate the Free Exercise Clause of the First Amendment of the United States Constitution?

### III

Whether any provisions of Section 3804 of H.P. 1395, L.D. 1751, delegates legislative power to any administrative unit in violation of Article IV, Part First, Section 1 of the Constitution of Maine?

### IV

Do any of the provisions of H.P. 1395, L.D. 1751, violate the provisions of Section 1 of Article VIII of the Constitution of Maine?

HOUSE OF REPRESENTATIVES
READ AND On Motion of Mr. Jalbert of Lewiston
January 6, 1970
Tabled Pending Passage
Under the Rules
Tomorrow Assigned
Bertha W. Johnson
Clerk

HOUSE OF REPRESENTATIVES
Speaker laid before the House
PASSED
January 7, 1970
Bertha W. Johnson
Clerk

Name: Jalbert

Town: Lewiston

A true copy,
ATTEST: Bertha W. Johnson
_____
(Mrs.) Bertha W. Johnson
Clerk of the House

(EMERGENCY)
FIRST SPECIAL SESSION

## ONE HUNDRED AND FOURTH LEGISLATURE

Legislative Document          No. 1751

H.P. 1395          House of Representatives,
                        January 6, 1970

The Committee on Education suggested.

BERTHA W. JOHNSON, Clerk

Presented by Mr. Jalbert of Lewiston.

## STATE OF MAINE

### IN THE YEAR OF OUR LORD NINETEEN HUNDRED AND SEVENTY

An ACT Creating the Nonpublic Elementary Education Assistance Act.

*Emergency preamble.* Whereas, a number of administrative units having control of public schools face the possibility that nonpublic elementary schools located within their area may be closed; and

Whereas, the Legislature has determined that it is in the public interest that the local administrative units shall be permitted to authorize the expenditure of public funds to assist said nonpublic schools; and

Whereas, municipal budgets must be immediately determined by the various subordinate administrative units levying taxes for support of public education; and

Whereas, the immediate availability of assistance to nonpublic schools may prevent further closings of said schools; and

Whereas, if said nonpublic schools are closed in some or all of the local administrative units, and any substantial number of the pupils thereof are immediately transferred to the public schools, there will of necessity be overcrowded and unsafe school facilities until the local units can build or acquire adequate facilities to relieve the impact; and

Whereas, said closings could create a demand for additional qualified teachers in substantial numbers without adequate time to plan for and to hire them; and

Whereas, the Legislature must act to prevent any possible interruption or disruption of the education of Maine children; and

Whereas, in the judgment of the Legislature these facts create an emergency within the meaning of the Constitution of Maine and require the following legislation as immediately necessary for the preservation of the public peace, health and safety; now, therefore,

Be it enacted by the People of the State of Maine, as follows:

*Sec. 1. R. S., T. 20, part 7, additional.* Title 20 of the Revised Statutes is amended by adding a new part 7, to read as follows:

### PART 7

### NONPUBLIC ELEMENTARY EDUCATION ASSISTANCE ACT

### CHAPTER 514

### NONPUBLIC ELEMENTARY EDUCATION ASSISTANCE ACT

§ 3801. Declaration of findings and intent

The Legislature finds and declares:

1. Elementary education crisis. That a crisis in elementary education exists in the nation and in the State of Maine involving rapidly increasing costs occasioned by the rise in school population and new and increasingly costly demands upon education generally. The general impact of inflation upon the economy has complicated the struggle of the State to find sources by which to finance education while attempting to finance other burdens which are also state governmental responsibilities;

2. Compulsory school attendance. That the requirements of the compulsory school attendance laws of the State may be legally fulfilled through appropriate attendance at nonpublic educational facilities;

3. Education public purpose. That the education of children generally and at the elementary level in particular is today recognized as a public purpose, and that nonpublic education through providing instruction in secular subjects makes an important contribution to the achievement of such public purpose and that the governmental duty to support public education generally may be in part fulfilled through the government support of those purely secular educational subjects and objectives achieved through nonpublic education;

4. Freedom of choice. The freedom to choose nonpublic education, provided it meets reasonable state standards, is a fundamental and basic right of all citizens of the State;

5. State's educational duty. That the State, in the fulfillment of its duties to provide education generally to its citizens, and elementary pupils in particular, has the right to enter into contracts for the purchase of needed educational services with persons or institutions, whether public or nonpublic, sectarian or nonsectarian;

6. Purchase of secular education. That should the present trend toward the closing of nonpublic schools continue, the burden cast upon the public school systems in the various cities and towns will cause intolerable local financial burdens and will also result in the need for very substantially increased assistance at the state level, and that the public interest would best be served through the purchase of secular educational services from nonpublic schools, under certain specific conditions.

§ 3802. Definitions

The following terms, whenever used or referred to in this chapter, shall have the following meanings, except in those instances where the context clearly indicates otherwise:

1. Academic year. "Academic year" shall mean the normal school year beginning in September and ending in June and in any event shall mean that portion of the calendar year in which a public or nonpublic school operates to satisfy the requirements of section 855.

2. Administrative unit. "Administrative unit" shall be as defined in section 851.

3. Commissioner of Education. "Commissioner of Education" shall be as defined in section 101.

4. Elementary school. "Elementary school" shall be understood to include that part of the school organization of an administrative unit in which is offered a program of studies preceding that offered by an approved secondary school as defined by section 1281 and shall generally mean kindergarten through grade 8.

5. Instructional materials. "Instructional materials" shall mean books, periodicals, documents, pamphlets, photographs, reproductions, pictorial or graphic works, musical scores, maps, charts, globes, sound recordings, including but not limited to those on discs and tapes; processed slides, transparencies, films, filmstrips, kinescopes and video tapes, or any other printed and published materials of a similar nature made by any method now developed or hereafter to be developed. The term includes those printed and published instructional materials, and also portable instructional equipment, suitable for and to be used by pupils in elementary schools and which with reasonable care and use may be expected to last more than one year, said instructional materials being limited to those which are presently used or have been in use within 5 years preceding the effective date of this Act in a public school, or instructional materials submitted to and approved by the Commissioner of Education. The term does not include furniture, nonportable equipment or items normally af-

fixed to the realty or forming a part of a building structure.

6. Instructional supplies. "Instructional supplies" shall include, but not necessarily be limited to, paper, chalk, pencils, crayons, art supplies, scientific supplies, nonreusable workbooks and other items not specifically defined in this chapter, which are used and consumed in the teaching of secular subjects to pupils.

7. Nonpublic school. "Nonpublic school" shall mean any elementary school other than a public school within the State wherein a pupil may legally fulfill the compulsory school attendance requirements of law, and said school shall have been in operation on the effective date of this Act. Any nonpublic school which was operating and in existence on January 1, 1970 may be considered a nonpublic school within the meaning of this section if said school is an elementary school within the State wherein a pupil may meet the compulsory school attendance requirements of law.

8. Pupil or student. "Pupil" or "student" shall mean a resident of the State who is in attendance in a nonpublic elementary school located within the State wherein he complies with the requirements of the compulsory school attendance law.

9. Purchase of secular educational services. "Purchase of secular educational services" shall mean the purchase by an administrative unit, from a nonpublic school, pursuant to contract, of secular educational service at the reasonable cost thereof.

10. Reasonable cost. "Reasonable cost" shall mean the actual cost to a nonpublic school of providing a secular educational service and shall be deemed to include solely the cost pertaining thereto of teachers' salaries, textbooks, instructional materials and instructional supplies. The reasonable cost of teachers' salaries as used in this chapter shall be deemed to be limited to the salary paid in the public school system of the administrative unit for a teacher of similar experience and education, or the actual cost, whichever is the lower.

11. Secular education service. "Secular education service" shall mean the providing of instruction in a secular subject.

12. Secular subject. "Secular subject" shall mean any course which is presented in the curricula of the public schools of the State and shall not include any subject matter expressing religious teaching, or the morals or forms of worship of any sect.

13. State Board of Education. "State Board of Education" shall be as defined in section 51.

14. Teacher. "Teacher" shall mean a person engaged in rendering secular educational service under this Act who shall be duly certified by the State Board of Education and who shall only teach secular subjects. Teachers shall not include school superintendents, principals or other administrators of a nonpublic school.

15. Textbook. "Textbook" shall mean any books, reusable workbooks or manuals, whether bound or in looseleaf form, intended for use as a principal source of study material for a given class or group of students, a copy of which is available for the individual use of each pupil in such class or group, said textbooks being limited to those which are presently used or have been in use within 5 years preceding the effective date of this Act in a public school, or textbooks submitted to and approved by the Commissioner of Education.

§ 3803. Administration—rules and regulations

In order to make uniform the administration of this chapter and to assist in the auditing of any expenditures hereunder by state and local officials and to insure strict compliance with all the terms and conditions imposed in this chapter, the Commissioner of Education is authorized to established. rules and regulations, forms of application and contracts, and such other documents and forms as he shall deem nec-

essary to carry out the purposes of this chapter, and require the use of same by all administrative units.

## § 3804. Purchase of secular educational service

The administrative units are authorized to contract and pay for secular education service, provided that as a condition precedent for contract and payment by the administrative unit purchasing the secular educational service from a nonpublic school that the appropriate body having jurisdiction over the public schools in the administrative unit shall first determine that:

1. Closing effect on property tax rate. The closing of a nonpublic school or schools educating its residents would have an adverse effect upon the unit's property tax rate; or

2. Classroom space. The closing of a nonpublic school or schools would cause a burden on the public school system by creating a shortage of or overcrowding of existing public classroom space, with resulting disruption of the education of the children involved.

## § 3805. Application

Applications for reimbursement of secular education service under this chapter shall be made by the appropriate officials of a nonpublic school or schools on or before January 1st to the appropriate body having jurisdiction over the public schools in the administrative unit within which the nonpublic school is located. The application shall be on such forms and under such conditions as the Commissioner of Education has prescribed pursuant to section 3803.

The application shall be based on the actual, where known, and the estimated expenditures for secular education service by the nonpublic school for the current academic year. The local administrative unit reviewing the application of a nonpublic school may, in its discretion, decide to appropriate for the purchase of secular educational service the maximum amount within the limitations of this chapter or any amount less than the maximum amount.

## § 3806. Determination

The appropriate body having jurisdiction over the public schools in the administrative unit shall notify the proper officials of the applicant nonpublic school or schools as to the amount of secular educational service which it wishes to purchase within 20 days after its budget has been approved by the administrative unit.

The payment so determined and authorized shall be made by the administrative unit in three equal installments payable on the first day of October, January and April of the academic year following the filing and acceptance of the application.

## § 3807. Records

Any nonpublic school seeking such payment shall maintain such accounting procedures, including the maintenance of separate funds and accounts, pertaining to the cost of secular education service so as to establish that it actually expended in support of said service an amount of money equal to the amount sought in reimbursement. Such separate accounts shall be subject to audit by the Commissioner of Education and the State Auditor or the administrative unit.

## § 3808. Limitation of reimbursement

In no event shall a nonpublic school be paid in excess of the cost actually expended by it in rendering secular educational service and shall not be paid unless in full compliance with the requirements and standards of this chapter.

## § 3809. Contracts limited to one year

The purchase of secular educational service from a nonpublic school by an administrative unit shall be done on a year-to-year basis and shall be subject to the annual appropriation process of that administrative unit.

## § 3810. General purpose aid

A municipality or administrative unit which purchases educational service pursuant to this chapter shall be allowed to compute a certain number of nonpublic elementary school pupils in the computation of the amount of that municipality's or administrative unit's equalization dollars for general purpose aid as provided by chapter 512. The number of nonpublic elementary school pupils which shall be used in computing the amount of general purpose aid shall be determined by chapter 512, notwithstanding the fact that said pupils do not appear upon the so-called public school census report which is filed annually with the Commissioner of Education nor any other provisions of the general purpose aid law to the contrary.

## § 3811. Teachers

Teachers in a nonpublic school shall not by reason of this chapter be deemed to be members of the State or any administrative unit; or be entitled to any of the rights or benefits provided by statute to public school teachers.

## § 3812. Liberal construction

Sections 3801 to 3812, being necessary for the welfare of the State and its inhabitants, shall be liberally construed to effect the purposes thereof.

*Sec. 2. R.S., T. 20, § 3732, amended.* Section 3732 of Title 20 of the Revised Statutes, as enacted by section 2 of chapter 496 of the public laws of 1969, is amended by adding at the end the following:

For the purpose of computing the amount of equalization dollars a municipality shall receive if it purchases educational services from a nonpublic school pursuant to chapter 514, there shall be added to the number of pupils in the municipality as determined by the average of the October 1st—April 1st counts, the average for the 2 fiscal years preceding the convening of the Legislature, a number of nonpublic school elementary pupils determined by the following formula:

"X" shall equal the number of nonpublic elementary school pupils to be added. "A" shall equal the amount of dollars reimbursed to the nonpublic school on a per pupil basis. "B" shall equal the per pupil operational cost of the public elementary school system of the municipality which purchases educational services pursuant to chapter 514. "C" shall equal the total number of nonpublic elementary school pupils of the municipality.

$$\frac{A \times C}{B} = X$$

"X" as determined above shall be multiplied by the per pupil reimbursement rate as established for the administrative unit. "X" shall not be used in determining the per pupil valuation.

*Sec. 3. Transitional provision.* Academic year 1970–71. For the purpose of providing payment funds for the academic year 1970–71, a nonpublic school shall submit an application by March 1, 1970. The application submitted on this date shall be based on the actual, where known, and the estimated nonpublic school expenditures for the academic year 1969–70, for the rendering of secular education service. If this application is approved by the administrative unit purchasing the secular education service and the secular education service meets the standards and requirements set forth in this chapter, the administrative unit may initiate payments for educational service rendered, commencing on October 1, 1970.

*Emergency clause.* In view of the emergency cited in the preamble, this Act shall take effect when approved.

## ANSWERS OF THE JUSTICES.

## TO THE HONORABLE HOUSE OF REPRESENTATIVES OF THE STATE OF MAINE:

In compliance with the provisions of Section 3 of Article VI of the Constitution of Maine, we, the undersigned Justices of

the Supreme Judicial Court, have the honor to submit the following answers to the questions propounded on January 7, 1970.

QUESTION NO. I. Do any of the provisions of H.P. 1395, L.D. 1751, violate the Establishment Clause of the First Amendment of the United States Constitution or Article I Section 3 of the Constitution of the State of Maine?

Inasmuch as opinions differ in response to Question No. I the several views subscribed by those adopting the same are respectfully submitted. Four of the Justices are of the opinion that H.P. 1395, L.D. 1751 is not constitutional. Two of the Justices are of the opinion that H.P. 1395, L.D. 1751 is constitutional. As to Question II, III and IV all Justices agree.

ANSWER: The answer is in the affirmative, as to sectarian schools.

Since the earliest days of the Federal Constitution it has been declared that its First Amendment erects a "wall of separation" between the Church and the State. While this phrase may seem archaic, the principle has not changed. A myriad of courts and legal writers over the years, the listing of which would serve no purpose, have dealt with the issue, not that the necessary independence in religious matters of the Church from the State and of the State from the Church no longer exists, but whether upon a given set of facts this wall has been breached or the mutual independence violated.

Increasingly, it has become desirable to formulate a test by which it could be determined whether a given proposition does or does not invade that independence.

The Supreme Court of the United States in School District of Abington Township Pennsylvania et al. v. Schempp, in forbidding bible reading in the public schools, decided in 1963 (374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844) declared that the test may be stated as follows:

"What are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

We are bound by this test.

In Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968, 6–3 decision), the Supreme Court of the United States upheld a New York statute against an attack under the Establishment Clause "because [the Act] authorizes the loan of text books to students attending parochial schools." In approving and applying the *Schempp* text the Court considered that there was no reason to distinguish the loan of text books from the bus transportation approved in 1947 in the landmark decision of Everson v. Board of Education 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, (1947). *Allen* did not involve the situation here presented in which the State would (in the words of the statute) contract for secular education service in a sectarian school and would enter into direct relationship with nonpublic or sectarian schools.

In approaching an analysis of the proposed legislation two threshold considerations arise:

a) "It is not what has been done, or ordinarily would be done under a statute, but what might be done under it, that determines whether it infringes upon the constitutional right of the citizen." Sleeper, Appellant 147 Me. 302, 308, 87 A.2d 115, 118.

b) That our Maine Constitution carries "no more stringent prohibitions than the First and Fourteenth Amendments to the Federal Constitution." Squires

v. City of Augusta, 155 Me. 151, 164, 153 A.2d 80, 88.

In November 1969, Lemon et al. v. Kurtzman et al., the Pennsylvania Non-Public Elementary and Secondary Education Act (Purdon's Pennsylvania Statutes, Title 24 Sections 5601–5609), was upheld constitutionally by a 2–1 decision by a three-Judge Federal Court, which decision is now on appeal to the U. S. Supreme Court. Finality has not been reached. The Pennsylvania Act is not identical to ours.

Our L.D. 1751 goes beyond the Pennsylvania Act (Pa.Act) in two critical areas. The Pa.Act proposed the purchase of secular educational service only in mathematics, modern foreign languages, physical science and physical education. Mr. Justice Douglas in his dissent in Allen, *supra*, 392 U.S. at page 1932, 88 S.Ct. 1923, advances a rationale for such limitation, the significance of which was not lost on the framers of the Pa.Act. L.D. 1751 is not so limited.

The Pa.Act declares its policy to be based on parental freedom to choose non-public educational resources which then were educating "more than twenty percent" of the school population and "(t)hat, should a majority of parents of the present non-public school population desire to remove their children to the public schools" the financial burden and derangement of public education would be allegedly intolerable. L.D. 1751 justifies itself on the threatened closing of non-public schools, with allegedly resultant dire effects on the public school system, which imminence, disclosed by supporting material, is prompted by financial need. Under the Pa.Act the financial benefit to the non-public schools was inferential. Under L.D. 1751 it is expressly and directly solicited.

The *Lemon* case is neither apposite in fact nor decisive in law, as applied to L.D. 1751.

Fundamentally it cannot be gainsaid that the sectarian school exists for the purpose of adding an additional dimension, to-wit, advancement of the faith, to the secular education which it supplies. If the parents sought only the secular education, such is available to them as a matter of right in the public school system. Sectarian school education is selected for its religious atmosphere and teaching.

■ Budgets for the secular instruction may be technically separable from the budget of the entire operation of the school, but the institution is an inseparable whole, which is strengthened in its institutional purpose when it is strengthened in any of its departments by outside financial assistance. See Schempp, *supra*, 83 S.Ct. page 1575. Economics is not the controlling factor in determining the validity or invalidity of L.D. 1751. The Constitution is the controlling factor. The school administrative units accomplish nothing under this Act that they could not reasonably accomplish within the public school systems and without benefit to sectarian schools.

Applying the *Schempp* test, the purpose and primary effect of L.D. 1751 is to subsidize those sectarian schools, the closing of which would cast an increased student burden on the public school system as measured under Section 3804. Such subsidization by its assuring the continuance of the school, assures the continuance of the purpose for which the school exists,—advancement of the faith it represents. The net result of all of this is for the State to invade the sectarian school system in a manner which violates the independence to which it is constitutionally entitled. The result is not the neutrality required by the Constitution.

With reference to the *Lemon* case, Chief Justice Robert B. Williamson is of the opinion that the Pennsylvania statute and L.D. 1751 are so closely alike that in his opinion a decision of the Supreme Court of the United States on the constitutionality of

the Pennsylvania Act under the Establishment Clause would in all probability control the issue with reference to L.D. 1751.

Respectfully submitted,
ROBERT B. WILLIAMSON
HAROLD C. MARDEU
RANDOLPH A. WEATHERBEE

TO THE HONORABLE HOUSE OF THE STATE OF MAINE:

In compliance with the provisions of the Constitution of Maine, I, the undersigned Justice of the Supreme Judicial Court, have the honor to submit the following answer to the first question propounded on January 7, 1970.

QUESTION (I): Do any of the provisions of H.P. 1395, L.D. 1751, violate the Establishment Clause of the First Amendment of the United States Constitution or Article I, Section 3 of the Constitution of the State of Maine?

ANSWER: I answer in the affirmative with respect to aid which may be furnished under the proposed legislation to sectarian schools providing instruction in both sectarian and secular subjects.

In my view we are required to give an informed anticipatory judgment as to what decision will be rendered by the Supreme Court of the United States when the precise issue here involved is presented to that Court for decision, either upon review of the very recent case of Lemon et al. v. Kurtzman et al. (1969) Civil Action, No. 69–1206 (District Court, E.D.Pa.), or by some other appropriate legal vehicle. To attempt to anticipate a decision of the Supreme Court of the United States in an area of the law as yet unexplored by that Court is at best fraught with uncertainty.

I look first to the opinion in Board of Education v. Allen (1968) 392 U.S. 236, 88 S.Ct. 1923 in which the Supreme Court found no First Amendment violation in a New York statute requiring local public school authorities to lend textbooks free of charge to all students in grades 7 through 12, including students attending private parochial schools. It is important to try to ascertain whether or not *Allen* marks the approximate limits beyond which the Supreme Court will not go in the field of church state separation. The Court first analyzed Everson v. Board of Education (1947) 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 as the "case decided by this Court that is most nearly in point for today's problem." *Everson* was based on the protection of the health, safety and welfare of children on the public streets and permitted bus transportation which would involve only a remote and indirect benefit to sectarian schools. The *Allen* Court recognized that there are First Amendment limits to the providing of public aid to sectarian schools when it said:

"Everson and later cases have shown that the line between state neutrality to religion and state support of religion is not easy to locate. The constitutional standard is the separation of Church and State. The problem, like many problems in constitutional law, *is one of degree.'"* (Emphasis mine).

The *Allen* Court made it clear that one must look beyond the stated purpose of legislation and see whether or not the necessary and primary effects thereof are the advancement or inhibition of religion. In determining that the lending of textbooks to all children including those in sectarian schools was permissible, the Court noted that the educational benefits are conferred upon the children rather than the school and that ownership of the books remained with the State. The Court said:

"Thus *no funds* or books *are furnished to parochial schools,* and the financial benefit is to parents and children, not to schools." (Emphasis mine)

My concern is that this language was an intentional caveat to suggest that when funds are furnished directly to parochial schools, the necessary and primary effect

thereof being to further their general purposes, such aid would be deemed violative of First Amendment principles and beyond the intended permissive scope of *Allen*.

Mr. Justice Harlan, while concurring in the *Allen* opinion, took occasion to remind us once again that the governmental activity, in order to be permissible within First Amendment strictures, must be one which "does not involve the State 'so significantly and directly in the realm of the sectarian as to give rise to * * * divisive influences and inhibitions of freedom.' " This suggests the possibility that the learned Justice would not go much beyond the reach of *Allen* in the direction of piercing the "wall of separation."

It may be noted that Mr. Justice Black was the writer of *Everson*, an opinion in which Mr. Justice Douglas joined. Yet both of these members of the Court were unable to take the step from *Everson* to *Allen* and each filed a vigorous dissenting opinion in the *Allen* case Mr. Justice Black penned words of admonition which in my view would not be rejected by his colleagues, even though a majority of the Court did not deem them applicable to the *Allen* facts. He said:

"The First Amendment's prohibition against governmental establishment of religion was written on the assumption that state aid to religion and religious schools generates' discord, disharmony, hatred, and strife among our people, and that any government that supplies such aids is to that extent a tyranny. And I still believe that the only way to protect minority religious groups from majority groups in this country is to keep the wall of separation between church and state high and impregnable as the First and Fourteenth Amendments provide."

In conclusion my concern is that what in the legislative proposal is termed a contract for secular educational service will be viewed as in reality a method for providing public aid to a sectarian school in support of all of its purposes, such subsidy to be computed on the basis of a formula which uses as a prime factor certain of its costs in furnishing secular education. In my opinion, such financial aid would not be permissible under the First Amendment.

Respectfully submitted,

DONALD W. WEBBER

### ANSWER OF ARMAND A. DUFRESNE, JR., Justice.

TO THE HONORABLE HOUSE OF REPRESENTATIVES OF THE STATE OF MAINE:

In compliance with the provisions of Section 3 of Article VI of the Constitution of Maine, I have the honor as a Justice of the Supreme Judicial Court to subscribe and submit the following answers to Question I propounded to the Justices of the Supreme Judicial Court by House Order dated January 7, 1970:

QUESTION I. Do any of the provisions of H.P. 1395, L.D. 1751, violate the Establishment Clause of the First Amendment of the United States Constitution or Article I Section 3 of the Constitution of the State of Maine? (1) Respecting the Establishment Clause of the First Amendment of the United States Constitution, I answer in the negative.

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion * * *." The United States Supreme Court has ruled that the Establishment Clause of the First Amendment is made applicable to the states by the Fourteenth Amendment of the United States Constitution. Cantwell v. State of Connecticut, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, Murdock v. Commonwealth of Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292. Its interpretation of that clause is the law of the land and is binding on the courts of this

State as well as on the Legislature by reason of the Supremacy Clause of Article VI of the United States Constitution. State v. Wheeler, 1969, Me., 252 A.2d 455. However, to this day, the United States Supreme Court has not adjudicated the constitutionality of any state law purporting, as the instant Nonpublic Elementary Education Assistance Act proposes, to purchase secular educational services by reimbursing the participating nonpublic elementary schools for the actual cost of teachers' salaries, textbooks and instructional materials after and to the extent that such costs have actually been incurred by the institution. Under such circumstances, the answer to this question will be the correct one only if it accords with the future decision of the United States Supreme Court. A review of the pertinent decisions leads me to believe that the present proposed legislation will receive constitutional imprimatur from the Supreme Court of the United States, and thus in anticipatory concurrence I say the intended Act violates in no way the Establishment Clause of the First Amendment.

The only authority in the country which has come to my attention has so ruled regarding Pennsylvania legislation upon which the proposed Act was obviously patterned. Lemon et al. v. Kurtzman et al., Civil Action, No. 69–1206, in the United States District Court for the Eastern District of Pennsylvania. This decision was rendered on November 28, 1969 by a statutory three-man court available in the federal system under congressional legislation when state statutes are under attack for alleged transgressions against the Constitution of the United States. I note that one member of that panel dissented. I am impressed by the reasoning of the majority which views the present legislation as a legitimate extension of the rulings of the United States Supreme Court in Everson v. Board of Education, 1947, 330 U.S. 1, 67 S. Ct. 504, and Board of Education v. Allen, 1968, 392 U.S. 236, 88 S.Ct. 1923. In *Everson* the United States Supreme Court held that the United States Constitution did not prohibit the State of New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as part of a general program in which the state paid the fares of pupils of public and other schools. In *Allen*, the United States Supreme Court upheld the constitutionality of a New York statute which provided for the purchase by the State of textbooks for the use of students in grades 7 to 12 in all schools of the State of New York, including parochial as well as public schools.

I am satisfied that the instant legislation does not on its face offend the Establishment Clause of the First Amendment. Initially, permit me to state that as individual Justices of this Court our approach to constitutional issues must be made without any concern being given to the propriety or wisdom of the legislative action. We must focus our consideration solely upon the issue of power of the Legislature to enact such legislation in light of the First Amendment prohibitions. We are charged with the duty of ascertaining legislative intent but not with any responsibility for economic and social effects of legislation. Coca-Cola Bottling Plants v. Johnson, 1952, 147 Me. 327, 87 A.2d 667. Whether or not the enactment of a law is the best means to achieve the desired results is a matter for the Legislature and not for the court. Cushing v. Inhabitants of Town of Bluehill, 1952, 148 Me. 243, 92 A.2d 330. Secondly, in our consideration of the constitutional issues involved, we must view the legislation, presently in the proposal stage, as if it had been already enacted and should accept as such the findings of facts which the lawmakers purport to make and declare in the reference Act. Issues which might be raised in application of the Act to divers and varied individual situations can neither be determined nor decided in advance of their *presentation.* These legislative findings above referred to are as follows: 1) a crisis in elementary education exists in the State of Maine by reason of rapidly in-

creasing costs occasioned by the rise in school population and new and increasingly costly demands upon education generally; 2) the education of children generally and at the elementary level in particular is today recognized as a public purpose, and nonpublic education through providing instruction in secular subjects makes an important contribution to the achievement of such public purpose and the governmental duty to support public education generally may be in part fulfilled through the government support of those purely secular educational subjects and objectives through nonpublic education; 3) should the present trend toward the closing of nonpublic schools continue, the burden cast upon the public school systems in the various cities and towns will cause intolerable local financial burdens and will also result in the need for very substantially increased assistance at the state level, and the public interest would best be served through the purchase of secular educational services from nonpublic schools, under certain specific conditions. These legislative findings, if adopted, should not be set aside lightly. While recitals of fact in a legislative act may not be conclusive, a decent respect for a co-ordinate branch of the government requires the courts to treat them as true until the contrary appears. Franklin Furniture Company v. City of Bridgeport, 1955, 142 Conn. 510, 115 A.2d 435. In these proceedings advisory in nature, such findings sufficiently establish as a fact that the proposed legislation was intended for the sole purpose of assuring the general diffusion of the advantages of secular education (Constitution of Maine, Art. VIII, Sec. 1) and in no way designed to advance or inhibit religion.

The issue remains whether the primary effect of the Act on its face or its necessary effect in administration is to promote or prohibit religion. The strictures put in the Act belie any such apparent effect and are proper safeguards against such end-results in operation. The educational services to be purchased are confined to instructions in a secular subject. The teacher whose educational services are purchased must be certified by the State Board of Education and must only teach secular subjects; in other words, an instructor in religion could not qualify, if he also participated in the secular part of the instructional program of the sectarian school. Textbooks are limited to those presently used or which may have been used in public schools within 5 years of the effective date of the Act; otherwise they must be submitted to and approved by the Commissioner of Education. Reimbursement for the secular educational services purchased is limited to the actual reasonable cost to the nonpublic school, payable in instalments after the services have been rendered; thus no surplus funds could be diverted to religious teaching or the advancement of religious purposes. The Commissioner of Education is empowered to establish uniform rules and regulations respecting the auditing of the expenditures subject to reimbursement and concerning forms of applications, contracts and other necessary documents to insure strict compliance with the provisions of the Act. Furthermore, the Legislature makes assistance under the Act conditional upon the factual finding by the municipal body having jurisdiction over the public schools in the administrative unit, 1) that the closing of a nonpublic school or schools educating its residents would have an adverse effect upon the unit's property tax rate; or 2) that the closing of a nonpublic school or schools would cause a burden on the public school system by creating a shortage of or overcrowding of existing public classroom space, with resulting disruption of the education of the children involved. These necessary prerequisite findings preclude characterizing the proposed legislation as an invidious breach of the Establishment Clause under the First Amendment. That Amendment mandates neutrality on the part of the State in its relations with religious believers and non-believers;

the use of state power to freeze or stifle religion is equally as obnoxious to the First Amendment as its use to favor it.

The education of our children is a proper subject of legislation; laws enacted for its furtherance are in the public interest and serve a public purpose. Cochran v. Louisiana State Board of Education, 1930, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913. Parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious or sectarian school rather than a public school if the school meets the secular educational requirements which the state has power to impose. Pierce v. Society of Sisters, 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; Board of Education v. Allen, supra.

The Act meets the test laid down by the United States Supreme Court in School District of Abington Township, Pa., v. Schempp, 1963, 374 U.S. 203, 83 S.Ct. 1560, to the effect that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. The proposed legislation essentially furthers a secular public purpose and any aid or benefit flowing from it to religious instruction or religion would be slight, vague and incidental. There is no essential difference between the proposed legislation and the constitutionally permissive legislation respecting busing of school children in *Everson* or the loan of textbooks in *Allen*. The mere fact that public funds are expended to an institution operated by a religious enterprise does not establish the fact that such funds are used to support the religion professed by the recipients. Vermont Educational Buildings Financing Agency v. Mann, 1968, Vt., 247 A.2d 68; Opinion of the Justices, 1968, Mass., 236 N.E.2d 523.

The dissent in *Lemon*, supra, rests mainly on abstract inferential assertions that sectarian institutions so intermix the secular with the religious or carry out the secular portion of their educational program with such overtones or in such atmos-

pheres of religion that state action purporting to reimburse the actual reasonable cost of alleged strictly secular instruction is in fact instrumental in the teaching of religion. In the absence of factual evidentiary support, such reasoning lacks persuasiveness. See, *Allen*, supra. Without the realities of proof, I am unable to say that the proposed statute, when in actual operation, will necessarily result in an unconstitutional involvement of the State with religious instruction. (2) Respecting Article I, Section 3 of the Constitution of Maine, my answer is that the proposed Act formulates no unconstitutional infringement thereof. This provision of our State Constitution prohibits the establishment by law of any subordination or preference of any one sect or denomination to another, and mandates that all religious societies in this State shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance. My answer to the previous question indicates that the proposed legislation in no way impairs the State's neutral role in religion, and the same may be said of the State's impartiality respecting the several religious sects. Furthermore, the Act does not restrict religious societies in the election of their public teachers nor in their contracts with them. It is only the actual cost of the teacher's educational service, when strictly confined to secular instruction, which is reimbursed to the school and only after it has been furnished. I see in the Act no violation of the above mentioned section of our Maine Constitution.

Dated at Augusta, Maine, this 15th day of January, 1970.

Respectfully submitted:

ARMAND A. DUFRESNE, Jr.

TO THE HONORABLE HOUSE OF REPRESENTATIVES OF THE STATE OF MAINE:

In compliance with the provisions of Section 3 of Article VI of the Constitution

of Maine, I, the undersigned Justice of the Supreme Judicial Court, have the honor to submit the following Answers to the Questions propounded on January 7, 1970.

QUESTION 1: Do any of the provisions of H.P. #1395, L.D. #1751, violate the Establishment Clause of the First Amendment of the United States Constitution, Article I, Sec. 3, or of the Constitution of the State of Maine?

ANSWER: I answer in the negative.

Finding myself in disagreement with at least some of my associates, I have some reluctance in expressing the reasons for my own conclusion. However, the individual opinion of each Justice is asked for, and although my personal wish is to defer to the views of my colleagues whose judgment at all times commands my respect, I feel that my duty demands that I set forth the reason why I would answer the first question submitted differently from the answers submitted by some of my colleagues.

In Squires v. Inhabitants of City of Augusta, 155 Me. 151 at 164, 153 A.2d 80 at 88, this Court said:

"In so saying we recognize that the decision of the Supreme Court of the United States in *Everson* is the law of the land and that the provisions of the Maine Constitution relating to the expenditure of public monies for public purposes and to the separation of church and state, carry no more stringent prohibitions than the First and Fourteenth Amendments to the Federal Constitution."

The First Amendment to the Federal Constitution has been judicially incorporated into the Fourteenth Amendment and now represents a limitation on both State action and Federal action. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

The present interpretation placed upon the First Amendment as it relates to "an establishment of religion" is well defined in Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923 (1968) and Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560 (1963). In these cases the following test was promulgated for distinguishing between "forbidden involvement" of the State with religion and those contacts which the Establishment Clause permits.

"The test may be stated as follows: What are the purpose and primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

*Allen* involved a New York statute permitting the Board of Education to *loan* secular textbooks approved by the Board of Education to students in both public and private schools at the request of the student. In the briefs and oral argument before the Supreme Court all parties to *Allen* suggested that in practice the authorities in the private schools submitted the request of the individual students to the Department of Education; that the books were delivered to the private schools and were allowed to be kept in the private schools. The Supreme Court approved the practice and declared it to be nonviolative of the Establishment Clause.

In *Schempp* the Court gave joint treatment to the basic questions arising under two slightly different factual situations. One was a public law of the Commonwealth of Pennsylvania which required that at least ten verses from the Holy Bible be read without comment at the opening of each public school on each school day. The other was a rule adopted by the Board of School Commissioners of Baltimore City, Maryland, providing for the holding of opening exercises in the schools of Baltimore consisting primarily of reading, without comment a chapter in the Holy Bible

and/or the use of the Lord's Prayer. *Schempp* held both practices to be violative of the Federal Constitution as being exercises of a religious character, and, therefore, not neutral, religion vis-a-vis "secularism."

Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, dealt with a statute authorizing reimbursement of parents for fares paid public carriers for the transportation of children attending public and Catholic schools. Mr. Justice Black, speaking for the majority, declared that the statute had not breached the wall between church and state which was erected by the First Amendment.

The difference between the actions found to be permissible in *Everson* and *Allen* and the practices barred by the First Amendment in *Schempp*, it is obvious, was that the impermissible action had an essentially religious purpose and its effect was primarily to advance the Christian religion and inhibit other religions or what Mr. Justice Clark described in *Schempp* as the "religion of secularism."

There is no gainsaying there is religious significance in a recitation of the Lord's Prayer or Bible reading. It is difficult to see the religious significance in riding on a bus, even a bus having as its ultimate destination a parochial school, or reading a textbook on mathematics, even if the reading is done in the basement of a Catholic Church which is free of religious trapping or in the recreation hall of a Jewish Synagogue.

The appellants in *Allen* asserted that all church-related education constitutes religious education and is, accordingly, disqualified from government aid. Their position rested on two related premises:

(1) That church-related education is one single enterprise rendered religious by the atmosphere and the motivation of the teachers, and

(2) That parochial schools employ teaching practices which implicitly permeate all subjects with religion.

A majority of the Court in *Allen* rejected the "single enterprise" view and adopted a "dual education" thesis.

The Court declared that parochial schools pursue both sectarian and secular goals. Allen v. United States, 392 U.S. at page 245, 88 S.Ct. 1923. The opinion referred to this view as having been "long recognized." The secular function, the Court said, is constitutionally qualified for aid while the sectarian function is not.

Mr. Justice Douglas, dissenting in *Allen,* accepted as an irrefutable presumption that there is no standard by which secular and religious textbooks can be distinguished from each other. The majority promptly rejected this conclusion, pointing out that public school officials are already required to distinguish and exclude religion when selecting texts for public school use.

I know of no reason to believe the Supreme Court of the United States will retreat from its "dual function" concept and will in the future hold that aid to the secular function of a parochial school is constitutionally impermissible.

The narrow questions, it seems to me, become, does the statute now under consideration,

(a) have as its purpose aid to the secular function of private schools, and

(b) is its primary effect to advance or inhibit religion?

Our proposed statute authorizes administrative units, in the circumstances there described, to contract and pay for secular educational services from nonpublic schools.

Secular education service is defined as providing instruction in a secular subject. This term is described as

"any course which is presented in the curricula of the public schools of the

State, and shall not include any subject matter expressing religious teaching, or the morals or forms of worship of any sect."

The Act would permit the administrative unit to pay the reasonable cost of textbooks which are used in the public schools of secular subjects, lay teachers' salaries, teaching materials such as chalk, pencils, etc., to be furnished students in elementary nonpublic schools who would be entitled to attend elementary public schools if they so desired.

The Act itself describes its purpose as public, i. e., the education of children at the elementary level. The Legislature, if it enacts the proposed statute in its present form, will declare a secular legislative purpose.

" 'The decisions of this Court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of a lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted.' McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78.

" 'Inquiry into the hidden motives which may move a Legislature to exercise a power constitutionally conferred upon it, is beyond the competency of courts.' " McGowen v. Maryland, 366 U.S. 420, at 469, 81 S.Ct. 1153, 6 L.Ed.2d 393.

Having in mind we are asked to pass upon the constitutionality of the proposed statute on its face, the conclusion seems to me inescapable that its overriding purpose is aid of *secular* education.

The Justices of this Court cannot predict every issue which may be presented as the result of the application of the proposed statute, should it become law. Such issues can be decided only if the occasion arises.

Would the primary effect of the proposed statute, if enacted, be to advance or inhibit religion?

It seems to me those who would answer Yes to this question accept Jefferson's metaphor, a "wall of separation," as a constitutional doctrine to be interpreted literally. To paraphrase Mr. Justice Reed in McCollum v. Board of Education, 333 U.S. 203, at page 245, 68 S.Ct. 461, 92 L.Ed. 649, they would draw a rule of law from a figure of speech. The permeation of religious teachings to the secular activities in church-oriented schools is inevitable, they argue. They would interpret *any* religious effect as a *primary* effect. The result is a "no aid" thesis, a thesis which has been rejected time and time again by the Supreme Court.

As early as 1899 in Bradfield v. Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168, the Supreme Court rejected the religious permeation view. The language of Mr. Justice Peckham in that case is especially apt to the problem at hand.

"Nor is it material that the hospital may be conducted under the auspices of the Roman Catholic Church. To be conducted under the auspices is to be conducted under the influence or patronage of that church. The meaning of the allegation is that the church exercises great and perhaps controlling influence over the management of the hospital. It must, however, be managed pursuant to the law of its being. That the influence of any particular church may be powerful over the members of a non-sectarian and secular corporation, incorporated for a certain defined purpose and with clearly stated powers, is surely not sufficient to convert such a corporation into a religious or sectarian body."

"Primary" is defined by Webster's as *first in importance* and *chief, principal.* Aid to parochial education often involves multiple effects, some secular, some religious. Most often the multiple effects are interwoven. The problem of ascertaining primary effect of a particular statutory scheme, I feel, does not lend itself to solution by the use of constitutional doctrinal process.

"It is idle to pretend that this task is one for which we can find in the Constitution one word to help us as judges to

decide where the secular ends and the sectarian begins in education. Nor can we find guidance in any other legal source. It is a matter on which we can find no law but our own prepossessions." Jackson, J., concurring in McCollum v. Board of Education, 333 U.S. 237, 68 S.Ct. 478.

The test promulgated in *Allen* is as far as the courts can and ought to go. Each new statutory scheme must be judged on an *ad hoc* basis. Within the limits proscribed in *Allen* the judgment is essentially political, not legal. The judgment must be made in the light of cumulating experience and revised community opinion.

I am satisfied the proposed statute, if enacted, would not offend either the letter or the spirit of the First Amendment of the Constitution of the United States or Article I, Section 3, of the Constitution of the State of Maine.

I would answer Questions #2, 3 and 4 exactly as do my colleagues.

Dated at Augusta, Maine, January 15, 1970.

Respectfully submitted,

CHARLES A. POMEROY

QUESTION NO. II. Do any of the provisions of H.P. 1395, L.D. 1751, violate the Free Exercise Clause of the First Amendment of the United States Constitution?

ANSWER: We answer in the negative.

■■ To constitute a violation of the Free Exercise Clause, it must appear that the legislation in its operation has a coercive effect upon the person alleged to be aggrieved thereby in the practice of his religion. *Schempp, supra,* and *Allen, supra.* On the face of the Act, no such discrimination appears nor can any be presumed.

QUESTION NO. III. Whether any provisions of Section 3804 of H.P. 1395, L.D. 1751, delegates legislative power to any administrative unit in violation of Article IV, Part First, Section 1 of the Constitution of Maine?

ANSWER: We answer in the negative.

■ The Legislature may not constitutionally delegate general legislative authority. State v. Prescott, 1930, 129 Me. 239, 151 A. 426. But it may delegate authority to a governmental agency charged with the duty of administering an act, provided the legislation sets up sufficient standards to guide the administrative body in the exercise of its discretionary functions respecting implementation of the law to particular situations. Smith v. Speers, 1969, Me., 253 A.2d 701. We are satisfied that the proposed Act furnishes adequate guidelines in full compliance with constitutional requirements.

QUESTION NO. IV. Do any of the provisions of H.P. 1395, L.D. 1751, violate the provisions of Section 1 of Article VIII of the Constitution of Maine?

ANSWER: We answer in the negative.

■ Article VIII of the Constitution of Maine is a mandate to insure the establishment of public schools, Sawyer v. Gilmore, 109 Me. 169, 83 A. 673, but it does not prevent the promotion of education by other constitutional means. Opinion of the Justices, 153 Me. 469, 471, 474, 145 A.2d 250. That portion of Article VIII dealing with "donation, grant or endowment" to any literary institution was intended to apply to the higher institutions of learning. Maine Constitutional Convention, Debates and Journal (1894 Reprint) Page 278 et seq.

Dated at Augusta, Maine, this 15th day of January, 1970.

Respectfully submitted:

ROBERT B. WILLIAMSON

DONALD W. WEBBER

HAROLD C. MARDEN

ARMAND A. DUFRESNE Jr.

RANDOLPH A. WEATHERBEE

CHARLES A. POMEROY

*Caveat*

The questions addressed to us do not ask for an opinion on the constitutional validity of Section 3802, Paragraph 7, but in anticipation of future questions or litigation in which the provision is involved, it is respectfully pointed out that there is a principle of constitutional law that for a statutory classification, here of schools, to meet constitutional requirements it must be of such a nature "as to embrace all those who may thereafter be in similar circumstances and conditions." 16 Am.Jur.2d Constitutional Law § 503 and specifically Fountain Park Co. v. Hensler et al., 199 Ind. 95, 155 N.E. 465 (Ind.1927) Sutton v. State, 96 Tenn. 696, 36 S.W. 697, 33 L.R.A. (Tenn. 1896).

When the classification is based upon time, "putting in one class all the instances existing on a designated date, and placing all others in another class" and where such procedure discriminates "unwarrantably in favor of establishments * * * existing * * * on a given date, such classification has been held a denial of equal protection of the laws." (Amendment XIV U.S. Constitution) 16 Am.Jur.2d. supra, § 512, and Mayflower Farms, Inc. v. Ten Eyck, 297 U.S. 266, 56 S.Ct. 457, 80 L.Ed. 675 (1936).

An exception has been recognized to a limited extent in "curative or remedial," and therefore temporary, statutes, within which our proposed L.D. 1751 does not fall.

The reference section is of doubtful constitutionality.

ROBERT B. WILLIAMSON

DONALD W. WEBBER

HAROLD C. MARDEN

RANDOLPH A. WEATHERBEE

CHARLES A. POMEROY

Mr. Justice DUFRESNE does not join in the expression of this caveat.