JOSEPH E. CLAYTON, ACTING COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF EDUCATION AND THE NEW JERSEY EDUCATIONAL FACILITIES AUTHORITY, A PUBLIC CORPORATION AND GOVERNMENT INSTRUMENTALITY IN THE DEPARTMENT OF EDUCATION, PLAINTIFFS-RESPONDENTS, AND ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN NEW JERSEY, PLAINTIFF-INTERVENOR-RESPONDENT, v. JOHN A. KERVICK, STATE TREASURER OF NEW JERSEY, DEFENDANT-APPELLANT, AND HOWARD LEVINE, JACQUELINE LEVINE, JOSEPH MARZELL AND BELLE MARZELL, DEFENDANTS-INTERVENORS-APPELLANTS.

Argued June 2, 1970—Decided July 20, 1970.

524

Mr. *Alfred C. Clapp* and Mr. *Arnold K. Mytelka* argued the cause for appellant.

Mr. *Leo Pfeffer,* of the New York bar, argued the cause for defendants-intervenors-appellants (Mr. *Lewis Stein,* attorney).

Mr. *Joel A. Wolff* argued the cause for plaintiff-intervenor-respondent (*Mr. William C. Slattery*, on the brief; *Messrs. Pitney, Hardin and Kipp*, attorneys).

Mr. *Stephen G. Weiss*, Assistant Attorney General, argued the cause for respondents (*Mr. George F. Kugler, Jr.*, Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. The question is whether the New Jersey Educational Facilities Authority Law, *N. J. S. A.* 18A:72A–1 *et seq.*, violates the church-state provisions of the Federal and State Constitutions. Other challenges to the statute were rejected in *Clayton v. Kervick*, 52 *N. J.* 138 (1968). The issue now before us was there reserved, the parties then contemplating that a record would be made with respect to it. Later on a motion it was concluded a record was not needed, and the issue was decided on the face of the statute. The trial court held there was no conflict with the church-state provisions. We certified the ensuing appeal before argument in the Appellate Division.

The statute is designed to provide funds to finance the construction of dormitories and educational facilities for public and private institutions of higher education. To that end, the statute created the New Jersey Educational Facilities Authority (herein Authority), "a public body corporate and politic." *N. J. S. A.* 18A:72A–4(a). It should be stressed at once that the statute does not provide for a gift or grant of State moneys to any institution. Rather the plan calls for the Authority to operate on a self-sustaining basis. The Authority sells its bonds to private sources and pays the principal and interest out of revenues gained by the use of the moneys so obtained. *Secs.* 11, 30, and 31. As to private educational institutions, the Authority may lend the moneys to the institution, or the Authority may erect a facility on lands conveyed to it by the educational institution, return the improved property to the institution

by a lease, and reconvey title upon full performance of the lease. Either way, the charge the Authority makes must cover the principal of and interest on the bonds the Authority issues for the moneys employed in the transaction. Thus there is no gift or grant of moneys. And the bonds are the obligations of the Authority alone. They are not debts of the State, and the State's credit is not pledged. *Secs.* 10 and 37. The bonds and property of the Authority are exempt from State and local taxation, *sec.* 18, and this, together with the exemption of the bonds from federal taxation, reduces the cost of money to the Authority and makes the plan feasible.

The purpose of the statute is stated in section 1:

It is hereby declared that a serious public emergency exists affecting and threatening the welfare, comfort, health, safety and prosperity of the people of the state and resulting from the fact that financial resources are lacking with which to construct required dormitory and other educational facilities at public and private institutions of higher education; that it is essential that this and future generations of youth be given the fullest opportunity to learn and to develop their intellectual and mental capacities; that it is essential that institutions for higher education within the state be provided with appropriate additional means to assist such youth in achieving the required levels of learning and development of their intellectual and mental capacities; that it is essential that all resources of the state be employed in order to meet the tremendous demand for higher educational opportunities; that all institutions of higher education in the state, both public and private, are an integral part of the total educational effort in the state for providing higher educational opportunities, and that it is the purpose of this chapter to provide a measure of assistance and an alternative method to enable institutions of higher education in the state to provide the facilities which are sorely needed to accomplish the purpose of this chapter, all to the public benefit and good, to the extent and manner provided herein.

To qualify for financing under the statute, a private college must be an institution for higher education. "Higher education" is defined in *N. J. S. A.* 18A:1–1 to mean "that education which is provided by any or all of public institutions of higher education as herein defined and any or all

equivalent private institutions," and that section, read with the definition of "public institutions of higher education" in *N. J. S. A.* 18A:62–1, means, for present purposes, that the private institutions, to be eligible under this statute, must offer higher education equivalent to that furnished by the public colleges. The "educational facilities" which may be constructed are many,[1] but there is expressly excluded "any facility used or to be used for sectarian instruction or as a place for religious worship." *Sec.* 3.

The First Amendment to the Federal Constitution, made applicable to the States by the Fourteenth Amendment, provides:

Congress shall make no law respecting an establishment of religion. or prohibiting the free exercise thereof * * *.

Our State Constitution provides in *Art. I,* ¶ 4:

There shall be no establishment of one religious sect in preference to another; no religious or racial test shall be required as a qualification for any office or public trust.

Our State provision is less pervasive, literally, than the Federal provision. Hence our discussion will be limited to the federal provision as interpreted by the United States Supreme Court.

■ The First Amendment sounds a note of neutrality: government may neither aid nor hinder religion. But the "wall of separation" is an elusive line. The threads of

[1] The full definition reads (*sec.* 3):

"Educational facility" means a structure suitable for use as a dormitory, dining hall, student union, administration building, academic building, library, laboratory, research facility, classroom, athletic facility, health care facility, and parking maintenance, storage or utility facility and other structures or facilities related thereto or required or useful for the instruction of students or the conducting of research or the operation of an institution for higher education, and the necessary and usual attendant and related facilities and equipment, but shall not include any facility used or to be used for sectarian instruction or as a place for religious worship.

religion appear in many patterns which are essentially secular. Hence the secular aim of a statute may touch the interests of religion, and when a statute does, the question arises whether it violates the "establishment clause" to accord to a sectarian institution the benefit of that secular aim or whether to deny that benefit because the institution is sectarian will inhibit religion and thereby equally offend the Amendment.

The current standard under the establishment clause was formulated in *School District of Abington Township, Pa. v. Schempp,* 374 *U. S.* 203, 222, 83 S. Ct. 1560, 1571, 10 *L. Ed.* 2d 844, 858 (1963) :

> The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.

The test, of course, is not self-executing, but it does offer some guidance.

■ We think the situation now before us is quite distant from the forbidden line. No one suggests the State must withhold such general services as police or fire protection, even though the property is exempted from general taxation because of its sectarian use. *Walz v. Tax Commission,* 397 *U. S.* 664, 90 S. Ct. 1409, 25 *L. Ed.* 2d 697, 703 (1970) ; *Board of Education of Central School District No. 1 v. Allen,* 392 *U. S.* 236, 242, 88 S. Ct. 1923, 20 *L. Ed.* 2d 1060, 1065 (1968). If the State may thus provide services to a purely sectarian interest when the supporting revenues are obtained by general taxation of the property of others, it should follow that governmental services sustained by revenues paid by the users may be offered to sectarian institutions for a like charge. Surely a government which sells water or electricity to the secular consumer may do business with a church upon the same basis.

A benefit may indeed be conferred upon the sectarian purchaser, for government may well provide services more economically than the private entrepreneur who was supplanted, but the benefit is common to all consumers and is not specially conferred upon the sectarian consumer as a contribution to its sectarian aims. So employees of a religious order need not be excluded from a social security, or a workmen's compensation program, merely because some public moneys may be incidentally involved in the program or because the employer is aided in the sense that it would not fare as well in the recruitment of employees if they were denied those benefits. And, if a State entered the general insurance business, it surely could offer coverage to sectarian interests at the rates charged others. Indeed, to refuse to sell such services to sectarian interests would at least invite the claim that religion is thereby inhibited.

Here we are dealing essentially with a banking operation conducted by an agency of the State. If the operation were as extensive as a general banking business, it could hardly be urged the establishment clause would bar every sectarian borrower. We see no difference in principle because the State has embarked upon a banking venture in a limited area in which, in words of section 1, "financial resources are lacking" for the construction of "required dormitory and other educational facilities at public and private institutions of higher education." Again, this is not to deny that the sectarian institution will derive a "benefit" from the governmental service. Obviously there is a benefit in obtaining something not provided by regular commercial sources, or in obtaining it at a lower rate of interest. Here, as in other areas of commercial activity a State may enter, the State has credit and tax advantages which reduce the cost of money to it, and, further, since the State has no stockholders, it may offer its service without a profit. The consumer thereby may enjoy a dollar benefit. But the fact remains that the State furthers a public purpose and the benefit to sectarian interests is as incidental as in the sale

of municipally supplied water or electricity. The Legislature, perhaps to avoid constitutional involvement under the establishment clause or perhaps to limit the statute to the furtherance of "higher education," expressly excluded "any facility used or to be used for sectarian instruction or as a place for religious worship" in its definition of "educational facility." No one contends this exclusion impinges upon the First Amendment, and we do not suggest that it does. The question is only whether the establishment clause requires government to refuse to sell to a sectarian institution a financing service it offers to others who except for religious identification are similarly situated. We are satisfied the Constitution holds no such mandate.

Since our statute does not involve a "grant" or "subsidy" or "aid" in the ordinary sense but rather provides a service on a self-sustaining basis, it is much more distant from the forbidden area than the situations in *Everson v. Board of Education*, 330 *U. S.* 1, 67 S. Ct. 504, 91 *L. Ed.* 711 (1946), which involved reimbursement for the expenses of transporting children to a parochial school, and in *Board of Education of Central School District No. 1 v. Allen, supra,* 392 *U. S.* 236, 88 S. Ct. 1923, 20 *L. Ed.* 2d 1060, in which textbooks were loaned without charge to grade students in parochial schools. Both programs involved expenditures out of the State treasury in aid of sectarian schools (or the students, as one may choose to view it). Both were upheld. For the same reason, the statute before us is more distant from the constitutional barrier than the Higher Education Facilities Act of 1963, 20 *U. S. C.* §§ 701–758 (1964), which provides for outright grants and was sustained in *Tilton v. Finch,* 312 *F. Supp.* 1191 (D. Conn. 1970), prob. juris. noted, 399 *U. S.* 904, 90 S. Ct. 2200, 26 L. Ed. 2d 558 (June 22, 1970); or the Maryland statute providing for "matching grants" which was held to be invalid as to certain sectarian institutions, *Horace Mann League of United States of America, Inc. v. Board of Public Works,* 242 *Md.* 645, 220 *A.* 2d 51 (Ct. App. 1966), *cert.* denied and appeal dismissed, 385 *U. S.*

97, 87 S. Ct. 317, 17 *L. Ed. 2d* 195 (1966); or the Pennsylvania statute purporting to "contract" with parochial schools for secular education of their pupils, sustained in *Lemon v. Kurtzman,* 310 F. Supp. 35 (E. D. Pa. 1969), prob. juris, noted, 397 U. S. 1034, 90 S. Ct. 1354, 25 *L. Ed. 2d* 646 (1970), the thesis of which was found invalid by a divided court in an advisory opinion in *Opinion of the Justices, Me.,* 261 *A. 2d* 58 (Sup. Jud. Ct. 1970).

A bill, which like ours, would provide financing for projects in higher education on a self-liquidating basis, was found to be valid in an advisory opinion, *Opinion of the Justices,* 354 *Mass.* 779, 236 *N. E.* 2d 523 (Sup. Jud. Ct. 1968), and a statute, with like features, was upheld in *Vermont Educational Buildings Financing Agency v. Mann,* 127 *Vt.* 262, 247 *A. 2d* 68 (Sup. Ct. 1968), juris. postponed, 394 *U. S.* 957, 89 S. Ct. 1302, 22 *L. Ed. 2d* 558, appeal dismissed under R. 60, 396 *U. S.* 801, 90 S. Ct. 9, 24 *L. Ed. 2d* 58 (1969).

We note, too, several cases which have held that a sectarian institution may compete to participate in urban renewal or redevelopment projects, in all of which the theme was that the institution dealt with government on the same *quid pro quo* basis as would any other private party. In each case a doubt was expressed as to whether it would violate the First Amendment to exclude a developer because of its sectarian identity. *64th St. Residences, Inc. v. City of New York,* 4 *N. Y.* 2d 268, 276, 174 *N. Y. S.* 2d 1, 5, 150 *N. E.* 2d 396 (1958), *cert.* denied, *sub nom. Harris v. City of New York,* 357 *U. S.* 907, 78 *S. Ct.* 1152, 2 *L. Ed.* 2d 1157 (1958); *Kintzele v. City of St. Louis,* 347 *S. W.* 2d 695, 700 (Mo. Sup. Ct. 1961); *Ellis v. City of Grand Rapids,* 257 *F. Supp.* 564, 575 (W. D. Mich. 1966).

To sum up, the statute seeks to achieve a wholly secular aim, the advancement of higher education, and its primary effect neither advances nor inhibits religion. The statute does not involve "aid" in the usual sense, but rather provides a needed financing service on a self-sustaining basis

to all private institutions which offer higher education equivalent to that of public institutions.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices, JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.