124 N.J. Super. 547 (1973)
308 A.2d 47
JOHN CERVASE AND ANTHONY IMPERIALE, PLAINTIFFS,
v.
KAWAIDA TOWERS, INC., A NEW JERSEY CORPORATION, LAWRENCE F. KRAMER, COMMISSIONER  NEW JERSEY DEPARTMENT OF COMMUNITY AFFAIRS AND CHAIRMAN NEW JERSEY HOUSING FINANCE AGENCY, AND THE CITY OF NEWARK, A MUNICIPAL CORPORATION, DEFENDANTS, AND B.J. BUILDERS OF NEW JERSEY, INC., INTERVENOR.
Superior Court of New Jersey, Law and Chancery Divisions.
Decided July 10, 1973.
*551 Mr. John Cervase, plaintiff pro se.
Mr. Henry J. Franzoni, Jr., for plaintiff Anthony Imperiale (Messrs. Franzoni & Sussman, attorneys).
Mr. Irving I. Vogelman, for defendant Kawaida Towers, Inc. (Messrs. Brown, Vogelman & Ashley, attorneys).
Mr. Richard W. Vail, Deputy Attorney General of New Jersey, for defendant Lawrence F. Kramer, Commissioner, New Jersey Department of Community Affairs and Chairman, New Jersey Housing Finance Agency (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
Mr. David R. Rudd, Asst. Corporation Counsel, for defendant City of Newark (Mr. William H. Walls, Corporation Counsel, attorney).
Mr. Theodore W. Geiser and Mr. Mark L. Fleder, for intervenor B.J. Builders of New Jersey, Inc. (Messrs. Hughes, McElroy, Connell, Foley & Geiser, attorneys).
KIMMELMAN, J.S.C.
Plaintiffs, residents and taxpayers of the north ward of the City of Newark, bring this action in lieu of prerogative writs to declare illegal and permanently enjoin the further construction of a 16-story medium to low income housing project now in the process of construction at 129-141 Lincoln Avenue, in their ward. The project, known as Kawaida Towers, is sponsored by a limited dividend nonprofit housing corporation, Kawaida Towers, Inc., incorporated pursuant to N.J.S.A. 55:16-1 et seq. Its total cost is financed by a 100% mortgage ($6,424,000) granted by the New Jersey Housing Finance Agency (HFA) under the authority of N.J.S.A. 55:14J-1 et seq. Kawaida *552 Towers, Inc. was formed under the aegis of Temple of Kawaida, a black, African-oriented religious organization whose spiritual leader is LeRoi Jones, otherwise known as Imamu Baraka.
The residents of the predominantly white north ward generally became aware of the project, and in particular of its black sponsorship, following ground-breaking ceremonies held in August, 1972. By mid-November construction had progressed to the stage where the footings and foundations had been substantially completed. At about that time neighborhood discontent arose and local residents began to demonstrate at the site. Plaintiffs thereupon instituted this litigation. The court temporarily enjoined construction for one week, primarily to afford an opportunity for the heated emotions to cool in order that an examination of the legal issues raised could be undertaken in a less excitable atmosphere. Thereafter, peaceful picketing was allowed at the site (see N.J. Const. (1947), Art. I, par. 18) under carefully prescribed conditions designed to allow workmen and equipment to gain access to the job. Nevertheless, further construction has been completely frustrated by reason of the inability of the general contractor to muster sufficient building and construction tradesmen willing to cross the picket lines for any meaningful work effort to be carried on.
In order to understand the legal challenges to Kawaida Towers, it is necessary to set forth the essential factual matters which occurred prior to the ground-breaking ceremonies.
1. On July 27, 1971 Mayor Gibson addressed a letter to the Newark City Council forwarding an application which had been filed on behalf of Kawaida Towers, Inc. for tax abatement status for a housing project to be constructed at 129-141 Lincoln Avenue in the city. He expressed his finding that the proposed project met a pressing need for housing and conferred his approval for the granting of a tax abatement.
2. On August 4, 1971 Rocco Rossi, the secretary of the Newark Board of Adjustment, addressed an official communication *553 to one of the attorneys representing the project, indicating that the preliminary plan for the proposed 210-family apartment house had been approved.
3. On September 15, 1971 the municipal council of the city, on motion of north ward councilman Frank Megaro, unanimously adopted resolution 7RC which approved the application of the promoters of Kawaida Towers, Inc. for construction of a project at 129-141 Lincoln Avenue, and pursuant to authorization contained in the Limited Dividend Non-Profit Housing Corporation Act, N.J.S.A. 55:16-1 et seq., granted a 50-year exemption from taxation. The pertinent text of the resolution follows:
WHEREAS, pursuant to R.S. 55:16-1 et seq., the promoters of Kawaida Towers, Inc., represent that Kawaida Towers, Inc., will be incorporated and duly qualified under the State statute, and will be approved by the Department of Community Affairs of the State of New Jersey; and
WHEREAS, the promoters of Kawaida Towers, Inc., have submitted to the Mayor an application for approval of a plan for the construction of a project located at 129-141 Lincoln Avenue in the City of Newark, and more particularly described in the application which accompanies, and by reference, is made a part of this resolution; and
WHEREAS, the Mayor has submitted such application to the Municipal Council with his approval thereof, a copy of which approval is annexed hereto and made a part hereof; and
WHEREAS, the Municipal Council has determined that said project meets an existing need, as is more particularly provided for in R.S. 15:16-14 [55:16-14] of said Act, and has further determined that the project will be an improvement made for the purposes of clearance, replanning, development or redevelopment of a blighted area within the City, as is provided in R.S. 15:16-18 [55:16-18] of said Act;
NOW, THEREFORE, BE IT RESOLVED BY THE MUNICIPAL COUNCIL OF THE CITY OF NEWARK, NEW JERSEY:
1. That the application of the promoters of Kawaida Towers, Inc., on behalf of Kawaida Towers, Inc., for the construction of the project herein described, be and is hereby approved in accordance with the recommendations of the Mayor, subject to the proper incorporation of Kawaida Towers, Inc., according to the provisions of the State statute and subject to approval of the Department of Community Affairs of the State of New Jersey.
*554 2. That exemption from taxation is subject to the approval of said plan and project by the Department of Community Affairs of the State of New Jersey.
3. Said exemption shall take effect for a period of 50 years in compliance with and subject to the provisions and conditions of R.S. 55:16-1 et seq.
4. On November 1, 1971 the consulting report of an expert in the moderate-income housing field was submitted by the project's sponsors to the HFA highlighting the features of the project and its feasibility.
5. On January 7, 1972 John C. Chieppa, project manager for the HFA, filed his investigative report with that agency, which again outlined the features of the project, the characteristics of the neighborhood and its feasibility for HFA financing.
6. On January 24, 1972 the Department of Community Affairs of the State of New Jersey, acting pursuant to the Revolving Housing Development Loan and Demonstration Grant Fund, N.J.S.A. 52:27D-59 et seq., authorized a non-interest bearing cash advance not to exceed $92,078 to Kawaida Towers, Inc., to help defray certain preliminary land, legal, architectural and other developmental costs of the project.
7. On May 25, 1972 the Attorney General's office approved the form of the certificate of incorporation for Kawaida Towers, Inc. as a limited-dividend, nonprofit housing corporation, and on May 26, 1972 the Public Housing and Development Authority in the Department of Community Affairs approved the filing of the certificate pursuant to N.J.S.A. 55:16-7. Up to that time Kawaida Towers, Inc. had been a simple Title 15 nonprofit corporation formed solely for the purpose of having a corporate name to facilitate the developmental stage of the proposed project.
8. Thereafter, the project was finally approved by the HFA for mortgage financing, and on July 20, 1972 a closing was held. Title to the site was taken by Kawaida Towers, Inc., and it in turn executed in favor of the HFA a permanent *555 mortgage, a mortgage loan agreement and a mortgage and regulatory agreement, all to secure a mortgage note of $6,424,900 and to provide for construction advances and for the regulation of the ownership and operation of the project upon completion. The mortgage closing statement shows disbursements of $580,820.73 as follows:

 1. Land: Abraham I. Mayer, et ux
 ($209,000. less seed
 Money deposit of $20,000)
 Balance of purchase price $189,000.00
 Extras per agreement 16,000.00
 Interest per agreement 8,733.22
 Taxes per agreement
 (1972 1st half) 1,777.28
 ___________
 Total $215,510.50
 2. Architect: Bottelli, Ohland & Martins
 (Total: $140,182, less
 seed money of $18,527,
 and 80% of that equals): 85,821.00
 3. Soil Investigation: ($1200 included in
 $16,000 extra acquisition cost) -0-
 4. Land Surveys: Borrie, McDonald & Watson
 ($750 ($600 included in
 $16,000 extra acquisition cost))
 Balance 150.00
 5. Project Planner: Moderate Income Housing, Inc.
 ($34,031, less seed money advanced of
 $5,616, and 80% of that equals): 22,732.00
 6. Legal Fees: Brown, Vogelman, Morris & Ashley;
 and Schanerman & Schanerman
 ($19,419, less seed money advanced of
 $3,286, and 80% of that equals): 12,906.00
 7. Field Representative: 15,000.00
 8. Insurance: New Jersey National Associates, Inc. 3,161.73
 9. Agency Fee: New Jersey Housing Finance Agency 64,249.00
 10. Financing Fee: New Jersey Housing Finance 96,374.00
 Agency
 11. Title Insurance and Examination: New Jersey
 Realty Title Insurance Company
 ($17,687.50 ($1500 included in $16,000
 extra acquisition cost)): Balance: 16,187.50
 12. Department of Community Affairs: Revolving
 Money Fund advances
 Appraisal: $ 500.00
 Accounting: 300.00

*556
 Administration: 500.00
 Architectural: 18,527.00
 Land option: 20,000.00
 Legal: 3,286.00
 Loan consultant: 5,616.00
 __________
 Total 48,729.00
 ___________
 GROSS AMOUNT REQUESTED $580,820.73
 ===========
 FROM BOND ANTICIPATION NOTE ACCOUNT $580,820.73
 ===========

Initially, plaintiffs challenge the validity of the real estate tax exemption granted to Kawaida Towers. The basic authority for the granting of tax exempt status is found in N.J. Const. (1947) Art. VIII, § III, par. 1. The policy for granting such form of tax relief, which specifically contemplates the limited dividend corporation plan, is contained in the following general language:
The clearance, replanning, development or redevelopment of blighted areas shall be a public purpose and public use, for which private property may be taken or acquired. Municipal, public or private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment; and improvements made for these purposes and uses, or for any of them, may be exempted from taxation, in whole or in part, for a limited period of time during which the profits of and dividends payable by any private corporation enjoying such tax exemption shall be limited by law. The conditions of use, ownership, management and control of such improvements shall be regulated by law.
Plaintiffs argue that tax exemptions may be granted by municipalities only to projects located within a legally declared blighted area as that term is defined, and refer by statute to N.J.S.A. 40:55-21.1 et seq., known as The Blighted Area Act, which defines the term and prescribes the procedure precedent to a declaration of blight. It is conceded that Newark has determined and declared the existence of extensive blighted areas. Lincoln Avenue, the site of Kawaida Towers, has never been declared to be a blighted area. N.J.S.A. 55:16-18, under which the tax exemption now in issue was granted, provides:
*557 When the governing body of any municipality in which a project of a housing corporation or housing association is or will be located, by resolution finds that the project is or will be an improvement made for the purposes of the clearance, replanning, development, or redevelopment of any blighted area (as defined in any law of this State) within such municipality, or for any of such purposes, then such project and improvement shall be exempt from all property taxation; provided, that in lieu of taxes the housing corporation or housing association owning said project shall make to the municipality payment of an annual service charge for municipal services supplied to said project, in such amount, not exceeding the tax on the property on which the project is located for the year in which the undertaking of said project is commenced or 15% of the annual gross shelter rents obtained from the project, whichever is the greater, as may be agreed to by the municipality and the housing corporation or housing association and approved by the authority. [Emphasis supplied]
In the interpretation of this section the overall purpose of the statute must be kept in mind. The Legislature sought to provide for the construction of new dwellings at rents which families can afford, in order to meet the severe housing shortage existing in the State. The provision for housing is to make possible and to assist the clearance, planning or development of blighted areas. In order to carry out this purpose, courts are enjoined to adopt a liberal construction of the act. N.J.S.A. 55:16-21 provides: "The powers enumerated in this act shall be broadly interpreted to effectuate the purposes hereof and shall not be construed as a limitation of powers."
Even without the direction for liberal construction, it would appear that the use in section 18 of the act of the wording "any blighted area" is most significant and, as will be seen, purposely differs from the wording contained in other housing acts which also provide for tax exemptions. Under the Limited Dividend Non-Profit Housing Corporation Act it is not necessary that the housing project itself be constructed in a blighted area in order to secure an exemption from real estate taxation. Nowhere in that act is a housing project defined as one necessarily to be located within a blighted area. It is sufficient that the project be located in a municipality that has any blighted area, and further, that the project be *558 an improvement made for the purpose of the clearance, replanning, development or redevelopment of any blighted area. Obviously, the project in question will assist in the clearance, replanning and development of any one of a number of blighted areas in the city by relieving the pressure of people and housing therein. Such has already been found as a fact by the Newark Municipal Council in adopting resolution 7RC. Alleviating pressure in a blighted area by relocating people being displaced to other areas undoubtedly facilitates the clearance, replanning and development of the blighted areas. The Legislature clearly had this purpose in mind when it authorized municipalities to confer tax exempt status upon limited dividend non-profit housing corporations.
Unlike section 18 of the Limited Dividend Non-Profit Housing Corporation Act, N.J.S.A. 55:16-18, other similar acts specifically confine the grant of tax exempt status to projects located within "a blighted area." For example, The Urban Renewal Corporation and Association Law of 1961, N.J.S.A. 40:55C-40 et seq. (popularly referred to as the "Fox-Lance Act"), defines a project as the undertaking of the redevelopment of "a blighted area," N.J.S.A. 40:55C-46; it sanctions tax exempt status for "improvement made in the development or redevelopment of a blighted area * * *." N.J.S.A. 40:55C-65.
Similarly, The Urban Renewal Non-Profit Corporation Law of 1965, N.J.S.A. 40:55C-77 et seq., defines a project as the undertaking of the redevelopment of "a blighted area," N.J.S.A. 40:55C-83; it likewise sanctions tax exempt status for "improvements made in the development or redevelopment of a blighted area * * *." N.J.S.A. 40:55C-97. See also, The Urban Redevelopment Law, N.J.S.A. 55:14E-1 et seq., applicable to projects for the clearance, replanning, development or redevelopment of "all or part of a blighted area," N.J.S.A. 55:14E-3, and again this law limits tax exempt status to "improvements made by way of rehabilitation or new construction, for the clearance, replanning, *559 development or redevelopment * * * of all or part of a blighted area * * *." N.J.S.A. 55:14E-11.
In summary, the legislative distinction drawn between the Limited Dividend Non-Profit Housing Act and the several urban renewal statutes is obvious. The former act does not require a housing project by definition to be located within a blighted area; the latter acts uniformly do. The former act authorizes tax exempt status for a project located in a municipality where there is "any blighted area"; the latter acts of necessity confine the tax exemption to projects constructed within a blighted area. The Limited Dividend Non-Profit Housing Corporation Act is intended to be much broader in scope. The ills of a blighted area are not always confined to a particular neighborhood but can and do affect an entire municipality. Consequently, the act was designed to be as broad as the problem it purports to relieve. Thus, the tax exemption granted to Kawaida Towers by the Newark Municipal Council on September 15, 1971 was a valid governmental act pursuant to statutory authority.
Plaintiffs next contend that the failure to submit the project to the Newark Central Planning Board for approval is a fatal omission. Several councilmen who appeared at the trial testified that they were under the impression that planning board approval was necessary before the grant of a tax exemption and that such approval had been given. Councilman Megaro, the project's sponsor, conceded however, that he had an indication from the corporation counsel that planning board approval was not necessary.
Regardless of the councilmen's impression, advance planning board approval was not required. There is nothing in the Limited Dividend Non-Profit Housing Corporation Act which requires prior approval. Additionally, the New Jersey Housing Finance Agency Law of 1967, N.J.S.A. 55:14J-1 et seq., requires only that the agency, in considering an application for a loan, must itself give consideration to:
*560 (a) The comparative need of the area to be served by the proposed project for housing for families of moderate income;
(b) The ability of the applicant to construct, operate, manage and maintain the proposed housing project;
(c) The existence of zoning or other regulations to protect adequately the proposed housing project against detrimental future uses which could cause undue depreciation in the value of the project;
(d) The availability of adequate parks, recreational areas, utilities, schools, transportation and parking;
(e) The availability of adequate, accessible places of employment; and
(f) Where applicable, the eligibility of the applicant to make payments to the municipality in which the housing project is located in lieu of local property taxes. [N.J.S.A. 55:14J-8]
The requirement of giving consideration to and taking cognizance of the existence of zoning or other regulations to protect adequately the proposed housing project against detrimental future uses which could cause undue depreciation in the value of the project, cannot be construed as a mandate that the HFA refer the project to the local planning board. The fact of the matter is that the HFA project manager, John C. Chieppa, who was familiar with the north ward, conducted a site inspection for the agency. He gave consideration to all of the elements required by N.J.S.A. 55:14J-8 and stated that in his opinion the project would upgrade the neighborhood. He was under no obligation to obtain advice or advance approval from the local planning board.
Plaintiffs further argue that the tax exemption, the Department of Community Affairs revolving housing development loan and the HFA mortgage financing itself all involve the expenditure of public funds which necessitate prior planning board approval in accordance with section 1.13 of the Municipal Planning Act (1953) N.J.S.A. 40:55-1.1 et seq. That section provides:
Whenever the planning board after public hearing shall have adopted any portion of the master plan, the governing body or other public agency having jurisdiction over the subject matter, before taking action necessitating the expenditure of any public funds, incidental *561 to the location, character or extent of one or more projects thereof, shall refer action involving such specific project or projects to the planning board for review and recommendation, and shall not act thereon without such recommendation or until forty-five days after such reference have elapsed without such recommendation. This requirement shall apply to action by a housing, parking, highway or other authority, redevelopment agency, school board, or other similar public agency, Federal, State, county or municipal. [Emphasis supplied]
Section 1.13 has no application to Kawaida Towers for two reasons. First, the legislative background of that section,[1] coupled with reasonable construction of its wording, indicates, that it is intended to apply only to projects being directly constructed by a "a housing, parking, highway or other authority, redevelopment agency, school board, or other similar public agency, Federal, State, county or municipal," all of which obviously require the expenditure of public funds. N.J. Turnpike Auth. v. Sisselman, 106 N.J. Super. 358, 365 (App. Div. 1969), certif. den. 54 N.J. 565 (1969).
Second, the "expenditure" of public funds within the meaning of the Municipal Planning Act is not involved in financing the construction of Kawaida Towers. The real estate tax exemption does not constitute an expenditure on the part of Newark. N.J.S.A. 55:16-18 requires that there be paid to the municipality in lieu of taxes an annual service charge for municipal services supplied to the project in an amount not less than what the taxes were on the basic land prior to construction, or 15% of the gross shelter rents, whichever is greater. Thus, the municipality suffers no outgo of funds nor does it lose any revenue which it would otherwise enjoy.
The revolving housing development fund loan was repaid at the mortgage closing and hence no expenditure of public funds was incurred in that respect.
*562 Finally, the HFA mortgage financing, which will amount to $6,424,900, cannot be considered an expenditure of public funds. The HFA was established in 1967 as a separate and distinct corporate body with power to issue bonds for the purpose of raising sufficient funds for the making of mortgage loans such as involved in this case. Its bonds are sold to the public at large. They are not guaranteed by the State. The income thereon is exempt from taxation, thereby enabling the bonds to be sold at an interest rate currently yielding approximately 4% a year. This is substantially less than the yield on private corporate borrowings. Mortgage loans made by the HFA currently bear interest approximating 5 1/2% a year, the differential being used to defray a portion of the cost of running the HFA which receives no appropriation from the Legislature. The legislative scheme envisioned by N.J.S.A. 55:14J-1 et seq. undoubtedly contemplates a self-sustaining public agency which may only make self-liquidating mortgage loans. Instead of manifesting the "expenditure" of public funds, there is evidenced the investment of funds in mortgage paper with every intention that the investment be recouped.[2] As ordinarily understood, no one expects an expenditure to be repaid or recouped; it is a disbursement of funds with the expender receiving only the services, goods or other elements for which the expenditure is made. An expenditure has been defined as `the spending or using up of money." Slurzberg v. Bayonne, 29 N.J. 106, 113 (1959). The receipt of a mortgage note or other evidence of an indebtedness in return *563 for an interest-bearing investment hardly connotes an expenditure.
Plaintiffs next challenge the funding of Kawaida Towers as public aid to a religious organization, thereby violating the constitutional mandate of separation of church and state. A similar challenge was unsuccessfully made with respect to the Educational Facilities Authorities Law, N.J.S.A. 18A:72A-1 et seq.; Clayton v. Kervick, 56 N.J. 523 (1970). That law likewise provided for the sale of bonds by an agency and the re-lending of the funds to facilitate the construction of educational facilities at both sectarian and nonsectarian institutions. The New Jersey Supreme Court held the activity of the agency to be a self-sustaining operation not involving the gift or grant of public funds. The funding was regarded not as an expenditure but rather as repayable borrowing and hence the court could find no "grant," "subsidy" or "aid" to a religious organization. The court said:
Here we are dealing essentially with a banking operation conducted by an agency of the State. If the operation were as extensive as a general banking business, it could hardly be urged the establishment clause would bar every sectarian borrower. * * * Again, this is not to deny that the sectarian institution will derive a "benefit" from the governmental service. Obviously there is a benefit in obtaining something not provided by regular commercial sources, or in obtaining it at a lower rate of interest. Here, as in other areas of commercial activity a State may enter, the State has credit and tax advantages which reduce the cost of money to it, and, further, since the State has no stockholders, it may offer its service without a profit. The consumer thereby may enjoy a dollar benefit. But the fact remains that the State furthers a public purpose and the benefit to sectarian interests is as incidental as in the sale of municipality supplied water or electricity. * * * The question is only whether the establishment clause requires government to refuse to sell to a sectarian institution a financing service it offers to others who except for religious identification are similarly situated. We are satisfied the Constitution holds no such mandate. [56 N.J. at 530-531]
The Educational Facilities Authorities Law is directly analogous to the New Jersey Housing Finance Agency Law of 1967. Accordingly, Clayton v. Kervick, supra, controls the *564 case at bar. The HFA law, related as it is to the financing of a limited-dividend, nonprofit housing corporation sponsored only incidentally by a religious organization, does not run afoul of the doctrine of separation of church and state. The benefit of the public funding inures to people who need housing rather than to a sponsoring religious group. In Hunt v. McNair, ___ U.S. ___, 93 S.Ct. 2868, 37 L.Ed.2d ___ decided by the United States Supreme Court on June 25, 1973, a similar type of public funding through the issuance of revenue bonds was held not to be violative of the Establishment Clause of the First Amendment.
Plaintiffs next urge that the certificate of incorporation of Kawaida Towers, Inc. is unlawful. They argue that there is withheld from the board of directors any semblance of discretion or authority in the direction and control of the corporation, thereby rendering the board "sterile," contrary to the General Corporation Law of New Jersey.
Article V of the certificate of incorporation of Kawaida Towers, Inc. contains the prohibition that "no one shall be elected as a member of the Board of Directors of the Corporation who is not a member in good standing of the Temple of Kawaida." Article VIII(d) further provides that
Each Director and shareholder of the Corporation must be a valid member of The Temple of Kawaida, a New Jersey Corporation formed pursuant to Title 16 of the Revised Statutes. Upon any Director's or stockholder's failure to maintain his membership in The Temple of Kawaida, the term of such Director shall terminate and the certificate of stock issued to such Director or Directors shall be canceled on the books of the Corporation and become null and void. Said stock shall be automatically reissued to the successor stockholding Director, who is a member of The Temple of Kawaida. It is expressly understood that membership in The Temple of Kawaida shall be a condition precedent to the holding of stock or serving as a Director of The Temple of Kawaida.
The testimony at the trial indicates that there are certain basic tenets involved in the Kawaida religion but that in essence the final authority on all matters affecting the religion and the standing of its members is Imamu Baraka *565 (LeRoi Jones) who is the "Supreme Being," the "ultimate judge" and, in effect, the "Pope." Consequently, since the directors of the corporation must always be and remain in good standing in the Temple of Kawaida, the argument is made that an unlawful "puppet-puppeteer" situation is created.
In Oleck, Non-Profit Corporations, Organizations and Associations (2d ed. 1965), § 218 at 450-451, the author states:
"Sterilization" of the board of directors of a corporation is strictly forbidden, as a host of statutes and decisions make crystal clear. Preemption of the essential powers of the directors, by a stockholder's agreement or by any other device (such as a foundation) is unlawful. A relation of directors to majority stockholders in which the directors are mere puppets in a "puppet-puppeteer" situation is improper and contrary to public policy. Statutes and cases permitting stockholders to limit the powers of directors to manage the corporation, in the case of an incorporated partnership, do not change the basic public policy as to control of corporate affairs by directors.

* * * * *
Such supine submission by the corporations' respective boards of directors, of course, warrants (but rarely results in) quo warranto action by the Secretary of State or Attorney General.
Domination of one corporation (let alone several) by a shareholder or other outside "owner", if so complete that the corporation "had * * * no separate mind, will or existence of its own," requires disregard of the corporate entity.
See also, 19 Am. Jur.2d, Corporations, § 1147 at 578, where the general proposition is stated thusly:
Directors of a corporation must act in behalf of the corporation in its management and cannot enter into agreements, either among themselves or with the stockholders, by which they abrogate their independent judgments. A contract by a director of a corporation that limits or restricts him in the free exercise of his judgment or discretion, or that places him under direct and powerful inducements to disregard his duties to the corporation, * * * and other(s) in the management of corporate affairs, is against public policy and void.
Cases such as Jackson v. Hooper, 76 N.J. Eq. 592, 603 (E. & A. 1910); Long Park Inc. v. Trenton-New Brunswick *566 Theatres Co., 297 N.Y. 174, 77 N.E.2d 633 (Ct. App. 1948), and Benintendi v. Kenton Hotel, Inc. 294 N.Y. 112, 60 N.E. 2d 829, 159 A.L.R. 280 (Ct. App. 1945), relied upon by plaintiffs, no doubt support the foregoing corporate principles. However, they are inapposite here.
The charge that the board of directors of Kawaida Towers, Inc. is dominated by an outside power, LeRoi Jones (Baraka), is without practical substance. Whatever power Jones might ordinarily possess to dominate the board has been effectively dissipated by legislative design in instances where a housing corporation is financed by the HFA. Article II(k) of the certificate of incorporation provides that the affairs of Kawaida Towers, Inc. shall be regulated by the HFA as to rents, tenant occupancy, method of operation and return. A fair reading of its certificate of incorporation indicates that the corporation cannot engage in any business other than the operation and management of Kawaida Towers. As a consequence, the only business which can be managed by the board of directors is subject to heavy regulation by the HFA. N.J.S.A. 55:14J-9 delegates to the HFA broad powers in rather explicit terms to regulate and control all affairs pertaining to housing projects financed by it. In that regard, a mortgage and regulatory agreement was required to be executed by Kawaida Towers, Inc., in favor of the HFA on July 20, 1972. The document was recorded in the office of the Register of Essex County on July 21, 1972 in Mortgage Book 4509 at page 124. It contains 12 pages of detailed limitations, restrictions and management functions imposed upon the corporation and its board, concluding in paragraph 19 with the right and power to
(d) Remove any and all of the existing officers and directors of the Mortgagor and appoint such person or persons who the Agency in its sole discretion deems advisable, including officers and employees of the Agency as new officers or directors to serve in the place of those removed;
or to
*567 (e) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement for the appointment of a receiver to take over and operate the Project in accordance with the terms of this Agreement, or for such other relief as may be appropriate, since the injury to the Agency arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.
Therefore, passing over the very questionable status of plaintiffs to complain of or make inquiry into regularity of the corporate powers to be exercised by Kawaida Towers, Inc., DiCristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 250 (App. Div. 1957), it would appear that the board of directors has already been "sterilized," not by the untoward influence of an outside force but rather by express statutory design, in order to fully protect the investment of public funds. Plaintiffs' challenge on this point must therefore fail.
Although not specifically designated in the pretrial order as an issue, it was developed and argued at the trial that the location of Kawaida Towers at 129-141 Lincoln Avenue offends the official master plan of the City of Newark adopted in 1965. According to Paul Cavicchia, a member of the central planning board, the master plan projects Lincoln Avenue as a medium density area with a range of 40 to 79 dwelling units an acre. Kawaida Towers, a 16-story high-rise, would have 210 dwelling units on a site slightly less than two acres in area, which would appear to be at variance with the master plan projection for Newark. This fact, however, is without legal significance.
A master plan is simply a proposal for the planned future growth and development of a municipality. N.J.S.A. 40:55-1.11. It need only be adopted by the local planning board. Approval of the plan by the governing body is neither required nor contemplated by the statute. It remains nothing more than a plan unless implemented by the municipal governing body in the form of zoning enactments. Until a master plan or parts thereof have been legislatively *568 adopted by the governing body, its proposals have no binding effect or legal consequences. Its proposals exist only as a hopeful declaration of policy expressing future guidelines for the municipality. Cochran v. Planning Board, Summit, 87 N.J. Super. 526, 535-536 (Law Div. 1965).
In the absence of legislative sanction of the master plan, Kawaida Towers need only comply with the current zoning ordinance of Newark. That ordinance places 129-141 Lincoln Avenue in a fourth residential district where high-rises not exceeding 140' in height are permitted on the size of the lot in question. The zoning board's letter, previously referred to, establishes the requisite compliance.
The remaining legal arguments advanced by plaintiffs have been considered but found to be insubstantial.
Inescapable is the fact, according to the testimony of Councilman Megaro, that the matter of Kawaida Towers was discussed at length on several occasions by the city council before the adoption of the tax exemption resolution. The councilmen did not deliberate in a vacuum, nor were they stampeded. Their decision was a valid exercise of the legislative discretion vested in them by their constituents.
Plaintiff John Cervase is convinced that Kawaida Towers must be stopped because it will breed crime and introduce violence into the neighborhood. There is no doubt that high-rise apartment buildings have come under attack in recent years as a major source of crime. According to a New York University research project reported in the New York Times edition of October 26, 1972, at page 45, there is a dramatic correlation between the height of a building and the crime rate: "The higher the building, the higher the crime rate."
Unfortunately, this court can function neither as sociologist nor statistician, and thus cannot legally assume that the dire consequences predicted by plaintiff Cervase will come to pass. On the contrary, this court must assume that the future tenants of Kawaida Towers will be law-abiding citizens. Under our system of jurisprudence, people are presumed innocent *569 of crime and it would be unthinkable for a court to condemn an entire project for crimes not yet committed.
The validity of high-rise housing projects as a governmental instrumentality utilized to help alleviate the shortage of low and moderate income living quarters is an issue to be debated and decided in a forum other than the courts. For the purpose of this case at least, that issue has been decided by the HFA and the Newark City Council. Accordingly, it is not for this court to entertain questions raised as to the wisdom of such official determination. Courts cannot usurp the functions of elected representatives, nor can courts invade the authority delegated by the Legislature to its agencies. It is not for courts to speculate upon or anticipate the social effects which will result from municipal or legislative action. In short, the social or economic belief of a court cannot be substituted for the judgment of officials who are either elected or appointed to exercise that judgment. Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L. Ed.2d 93 (1963); A. & B. Auto Stores, etc. v. Newark, 59 N.J. 5, 19 (1971); Frank v. Briel, 96 N.J. Super. 67, 71 (Ch. Div. 1967); Grenewicz v. Ligham, 34 N.J. Super. 1, 11 (App. Div. 1955).
One final observation is in order. In bringing this action, plaintiffs have plainly failed to comply with the applicable time limitations for challenging action of governmental bodies. R. 4:69. They are clearly out of time. Nevertheless, the questions involved have generated sufficient public interest and therefore have compelled the court to disregard the tardiness of the litigants. The importance to the community of a decision based upon the merits of this controversy has clearly motivated the court's determination to avoid a dismissal of the action based upon procedural technicalities. Jacobs v. New Jersey State Highway Authority, 54 N.J. 393, 396 (1969); Kent v. Mendham, 111 N.J. Super. 67, 76 (App. Div. 1970); Riddlestorffer v. Rahway, 82 N.J. Super. 36, 42 (Law Div. 1963).
*570 By reason of the foregoing the consolidated complaints will be dismissed with prejudice and without costs.
NOTES
[1] See, e.g., `The Importance of New Planning Legislation to Your Municipality," by Herbert H. Smith, Chief, State Planning Section, New Jersey Department of Conservation and Economic Development, 30 N.J. Municipalities, 7, 10 (November 1953).
[2] See the statement by Paul N. Ylvisaker, Commissioner of the Department of Community Affairs, on March 30, 1967, before a Joint Senate and Assembly committee public hearing on Assembly Bills 757, 763, 765, 766, 767, 768 and 804:

"This is not a public program in the sense that the state will do construction or operate rental units, and this is not an expenditure program. It is an investment program which does not tax the budget of the state. * * *" (99A of transcript).